# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs May 20, 2014

## STATE OF TENNESSEE v. ASHLEY K. MOYERS

**Appeal from the Circuit Court for Blount County**
**No. C-19816    David R. Duggan, Judge**

———————————————

**No. E2013-01608-CCA-R3-CD - Filed June 25, 2014**

———————————————

Ashley K. Moyers ("the Defendant") was convicted by a jury of sale or delivery of a Schedule II drug in a drug-free zone.  Following a sentencing hearing, the trial court sentenced the Defendant to four years' incarceration and imposed the $40,000 fine assessed by the jury.  On appeal, the Defendant challenges the sufficiency of the evidence supporting her conviction.  She also contends that her $40,000 fine is excessive.  After a thorough review of the record and the applicable law, we affirm the Defendant's conviction but decrease the Defendant's fine from $40,000 to $2,000.

## Tenn. R. App. P. 3 Appeal as of Right; Judgment
### of the Circuit Court Affirmed as Modified

JEFFREY S. BIVINS, J., delivered the opinion of the Court, in which THOMAS T. WOODALL and D. KELLY THOMAS, JR., JJ., joined.

J. Liddell Kirk, Knoxville, Tennessee (on appeal); and Mack Garner, Maryville, Tennessee (at trial), for the appellant, Ashley K. Moyers.

Robert E. Cooper, Jr., Attorney General and Reporter; Deshea Dulany Faughn, Assistant Attorney General; Mike Flynn, District Attorney General; and Matthew Dunn, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**Factual and Procedural Background**

A Blount County Grand Jury indicted the Defendant on one count of sale or delivery of a Schedule II drug within one thousand feet of a drug free zone.[1] The Defendant proceeded to a jury trial on March 20-21, 2012.

Ray Boswell testified at trial as an expert in the field of Geographical Information System ("GIS") mapping. He explained that he worked as a GIS manager for the City of Maryville and the City of Alcoa. In preparation for trial, Boswell compiled a map depicting Oldfield Park and "a 1,000 foot buffer around that park." Boswell agreed that the address, 602 Wright Road, the address where the alleged sale or delivery took place, was within that 1,000 foot radius of Oldfield Park. According to Boswell's data, 602 Wright Road was located approximately 781 feet from Oldfield Park.

Christopher Hulsey testified that he was employed with A-1 Bonding. He had served as a confidential informant for the Blount County Sheriff's Department. He explained that, as a confidential informant, he would "[b]uy drugs from certain individuals." On February 2, 2011, Hulsey planned to buy fifteen-milligram pills of "Roxicodone or Roxies" from an individual named Corey Williams at the residence of Melanie Roberts. The plan was to buy four pills for $50 total, which Hulsey confirmed was a fair rate for the street value of this drug.

On February 2, 2011, Hulsey met with Agent Aycocke of the Fifth Judicial District Drug Task Force as he arranged to buy the Roxicodone from Corey Williams. When Hulsey arrived at Melanie Roberts' residence, he observed Williams and the Defendant drive by the house. He noted that Williams was driving and that the Defendant was in the passenger seat. Williams and the Defendant parked in front of the residence located at 602 Wright Road, and Hulsey approached their vehicle. Hulsey knew the Defendant's first name at the time of this scheduled buy but did not know her "on a personal level." Later, he identified the Defendant out of a photographic lineup. He testified regarding the encounter,

> I made contact with [Williams]. . . . [Williams] had instructed [the Defendant]
> to get the stuff, as he pretty much said. She reached down into the floorboard,
> the passenger floorboard of the front seat, to her purse. Pulled out a

---

[1] According to Tennessee statute, a drug free zone is the area within a one thousand-foot radius of a school or various other specified grounds, including a park. See Tenn. Code Ann. § 39-17-432(b)(1) (2010).

prescription pill bottle that had two pills in it. I asked them if that was two 30's. [Williams] had told me yes. I then asked if she had any more of those to get rid of. At that time, she stated she did not have any more to get rid of.

Hulsey explained that the watch he wore that evening was a recording device that was supposed to record audio and video, but the watch failed to record video for some reason. During the transaction, Williams offered Hulsey "a large amount of crack cocaine," and Hulsey responded that he needed to "go back and get some more money." Additionally, another individual walked up to the vehicle to make a purchase, but Hulsey did not know who that person was. Hulsey confirmed that, in addition to Williams and the Defendant, a two or three-year-old child was sitting in the back of car. At the conclusion of the transaction, Hulsey returned to the meeting spot with Agent Aycocke.

On cross-examination, Hulsey confirmed that he previously had been convicted of theft, driving under the influence, and possession of illegal drugs. He also confirmed that he had a long history of drug addictions. Hulsey explained how he met Agent Aycocke and that he was paid $50 to $100 for each controlled buy of narcotics in which he participated. He estimated that he participated in more than 100 controlled buys.

Agent Rusty Aycocke, with the Fifth Judicial Drug Task Force for the Blount County Sheriff's Office, testified that he had been acquainted with Hulsey for a number of years but that Hulsey began working for him as a confidential informant sometime after September 2009. On February 2, 2011, Agent Aycocke met Hulsey at a pre-arranged location to set up multiple controlled buys, including the controlled buy related to this case. Hulsey called a phone number that he knew to belong to Williams and coordinated a purchase of "15 milligram Oxycodone." Although Agent Aycocke did not accompany Hulsey for the transaction, he "did follow Mr. Hulsey on this day and kept a constant visual sight of him" during the transaction. Following the transaction, Hulsey returned directly to the pre-arranged location to meet Agent Aycocke. Agent Aycocke retrieved the contraband from Hulsey that he sealed in an envelope and sent to the Tennessee Bureau of Investigation ("TBI"), who later identified the pills as Oxycodone. Agent Aycocke, before sending the pills to the TBI, self-identified the pills as two, thirty-milligram Oxycodone pills, noting that the pills were a generic brand called "Roxicet or Roxicodone."

At the time the transaction was arranged, Hulsey only knew that Williams would be present to make the sell. However, after Hulsey completed the purchase, he informed Agent Aycocke that Williams' girlfriend, the Defendant, was present with Williams for the transaction. Although Hulsey only knew the Defendant's first name on the day of the purchase, he called Agent Aycocke on the following day to provide her last name. Agent

Aycocke prepared a photographic lineup for Hulsey, and Hulsey immediately identified the Defendant as the individual with Williams at the time of the purchase.

Agent Aycocke confirmed that he spoke with the Defendant on the day she was arrested in May 2011. The Defendant told Agent Aycocke that the vehicle Williams had been driving on the night of the purchase, a white Mercury Mountaineer, belonged to her. Additionally, the phone number that the Defendant provided to Agent Aycocke as her phone number was the same number that Hulsey had called to set up the purchase. The Defendant admitted to Agent Aycocke that "Corey [Williams] would purchase quantities of Oxycodone at times and resell them for a profit. And [she] further stated that on several occasions that [she] and Corey would be together in her vehicle and . . . would together . . . go and make deliveries and sales of the Oxycodone."

The State entered into evidence several recorded telephone conversations of the Defendant while she was incarcerated. In one of the conversations, she stated, "They knew I was with Corey Williams."

On cross-examination, Agent Aycocke acknowledged that he knew Hulsey had "made some wrong choices" in the past and that he had friends who were breaking the law. Regarding his offer to Hulsey to become a confidential informant, Agent Aycocke knew that Hulsey had "associates and friends in the drug culture" and that Hulsey "would at least be able to assist [him] with information."

At the conclusion of the State's proof, the defense proceeded with its case-in-chief. Latasha Goss testified that she had met and began working with the Defendant approximately five or six years prior to trial. On February 2, 2011, she hosted her son's twelve-year-old birthday party at her home from approximately 4:00 p.m. to 7:00 p.m. The Defendant arrived early to the party to help Goss set up. Goss knew that the Defendant was dating Williams, but she denied that Williams attended the party with the Defendant. At approximately 7:00 p.m., the Defendant left the party. Goss stated that the Defendant did not leave the party from the time she arrived until the party ended at 7:00 p.m.

On cross-examination, Goss estimated that a total of approximately forty adults and children were present at her son's birthday party. Goss stated that she would be surprised to know that the Defendant previously testified that the Defendant, in fact, was in the vehicle with Williams. Goss testified, "I don't know how [the Defendant] could be two places at once." Goss denied having physical invitations for the birthday party because she "called everybody." Goss explained that the Defendant had three children, but she only remembered seeing two of the children at the party. When asked how the Defendant arrived at her house that day, Goss recalled the Defendant's telling her that Williams dropped off the Defendant.

Following Goss' testimony, the Defendant decided not to testify and offered no further proof. The State re-called Agent Aycocke, who testified that he arrived at the location of the transaction at approximately 5:05 p.m. and left that location at approximately 5:12 p.m. Agent Aycocke confirmed that, from where he was parked during the transaction, he could see Goss' residence. He estimated that his car was parked approximately 200 feet from where the transaction occurred. When asked what he saw at Goss' residence, he stated,

> Nothing out of the ordinary. There certainly wasn't a high volume of traffic, cars parked on the street or in the driveway like you would expect if you're having a party with 40 persons or so. And nothing out of the ordinary as far as a large gathering of people.

Agent Aycocke explained further that he would have noticed a large gathering of people or cars because his confidential informant had to walk past that residence in order to meet up with Williams and the Defendant. He denied seeing children outside playing at Goss' residence.

Agent Aycocke confirmed that the voice on the recorded jail phone conversation was the voice of the Defendant. He denied that, during his interrogation of the Defendant, the Defendant ever mentioned having been at a birthday party on the day of the transaction.

At the conclusion of the proof at trial, the jury deliberated and convicted the Defendant of sale or delivery of a Schedule II controlled substance within a drug-free zone and assessed a fine of $40,000.

At the sentencing hearing, the presentence report was admitted into evidence without objection from the Defendant. Agent Rusty Aycocke testified at the sentencing hearing that this case was part of a larger investigation. He stated, "We were using a confidential source to make multiple controlled drug buys from multiple persons. . . . This investigation netted during a drug roundup about 42 separate persons being arrested." Agent Aycocke confirmed that the area in which this investigation occurred was known to have "a high volume of drug activity." On cross-examination, Agent Aycocke stated that Williams already had pleaded guilty to an offense associated with this case.

In sentencing the Defendant, the trial court found the Defendant to be a Range I offender. As an enhancement factor, the trial court considered the fact that the Defendant had a prior criminal history. The trial court also considered as an enhancement factor that the Defendant was on probation at the time the offense in this case was committed. The trial court did not afford any weight to mitigating factors. Accordingly, the trial court sentenced the Defendant to four years' incarceration and imposed the $40,000 fine assessed by the jury.

The Defendant filed a motion for new trial, challenging the sufficiency of the evidence supporting her conviction. Following the hearing on the motion for new trial, the trial court denied the Defendant's motion. The Defendant timely appealed, challenging the sufficiency of the evidence and her $40,000 fine.

## Analysis

### *Sufficiency of the Evidence*

The Defendant first argues on appeal that the evidence presented at trial is insufficient to support her conviction for sale or delivery of a Schedule II drug in a drug free zone. Our standard of review regarding sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e). After a jury finds a defendant guilty, the presumption of innocence is removed and replaced with a presumption of guilt. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992). Consequently, the defendant has the burden on appeal of demonstrating why the evidence was insufficient to support the jury's verdict. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

The appellate court does not weigh the evidence anew. Rather, "a jury verdict, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts" in the testimony and all reasonably drawn inferences in favor of the State. State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992). Thus, "the State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom." Id. (citation omitted). This standard of review applies to guilty verdicts based upon direct or circumstantial evidence. State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (citing State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). In Dorantes, our supreme court adopted the United States Supreme Court standard that "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." Id. at 381. Accordingly, the evidence need not exclude every other reasonable hypothesis except that of the defendant's guilt, provided the defendant's guilt is established beyond a reasonable doubt. Id.

The weight and credibility given to the testimony of witnesses, and the reconciliation of conflicts in that testimony, are questions of fact. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). Furthermore, it is not the role of this Court to reevaluate the evidence or substitute its own inferences for those drawn by the jury. State v. Winters, 137 S.W.3d 641, 655 (Tenn. Crim. App. 2003) (citations omitted).

The Defendant was convicted of sale or delivery of a Schedule II drug in a drug-free zone. In Tennessee, it is a Class C felony to sell or deliver a "Schedule II controlled substance, including cocaine or methamphetamine in an amount of less than point five (.5) grams." Tenn. Code Ann. § 39-17-417 (2010). Additionally, if the commission of this offense "occurs on the grounds or facilities of any school or within one thousand feet (1,000') of the real property that comprises . . . [a] park," Tenn. Code Ann. § 39-17-432(b)(1) (2010), the offender "shall be subject to the additional fines imposed by this section." Id. at § -432(3).

Tennessee statute defines "deliver" as "the actual, constructive, or attempted transfer from one person to another of a controlled substance, whether or not there is an agency relationship." Tenn. Code Ann. § 39-17-402(6) (2010). Oxycodone is classified as a Schedule II drug. See Tenn. Code Ann. § 39-17-408(b)(1)(M) (2010).

The State's theory of the case at trial was that the Defendant was guilty under a theory of criminal responsibility. A person is criminally responsible for crimes committed by another when, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense." Tenn. Code Ann. § 39-11-402(2). Our supreme court has explained that "[t]he justification for this theory of criminal liability is that, in addition to the primary criminal actor, aiders and abettors should be held accountable for the criminal harms they intentionally facilitated or helped set in motion." State v. Sherman, 266 S.W.3d 395, 408 (Tenn. 2008). As long as the State can prove that a defendant knowingly, voluntarily, and with common intent joined with the principal offender in the commission of the crime, the State may seek to hold the defendant criminally liable as a principal under the theory of criminal responsibility for the conduct of another. Id.; see also State v. Hatcher, 310 S.W.3d 788, 811 (Tenn. 2010). "The requisite criminal intent may be inferred from the defendant's 'presence, companionship, and conduct before and after the offense.'" State v. Crenshaw, 64 S.W.3d 374, 384 (Tenn. Crim. App. 2001) (quoting State v. McBee, 644 S.W.2d 425, 428-29 (Tenn. Crim. App. 1982)). While a person's mere presence during the commission of a crime is not sufficient to confer criminal liability, it is not necessary that he or she take physical part in the crime. Sherman, 266 S.W.3d at 408. Rather, encouragement of the principal actor will suffice. Id. A defendant convicted under a theory of criminal responsibility for the conduct of another is considered a principal offender to the same extent as if he had committed the offense himself. See Hatcher, 310 S.W.3d at 811.

The Defendant specifically argues that the evidence is not sufficient to support her conviction because the State failed to establish the Defendant as the female present with Williams at the time of the transaction. The evidence established at trial that a confidential informant, Christopher Hulsey, purchased Oxycodone from the Defendant and Corey

Williams on February 2, 2011. Hulsey testified that he planned to purchase the "Roxicodone or Roxies" from Williams at the residence of Melanie Roberts. When Hulsey arrived at the agreed-upon location, the Defendant was in the passenger seat of the vehicle in which Williams arrived. Hulsey only knew the Defendant by her first name at the time of the transaction, but he later identified her as the Defendant in a photographic lineup. Hulsey testified,

> I made contact with [Williams]. . . . [Williams] had instructed [the Defendant] to get the stuff, as he pretty much said. She reached down into the floorboard, the passenger floorboard of the front seat, to her purse. Pulled out a prescription pill bottle that had two pills in it. I asked them if that was two 30's. [Williams] had told me yes. I then asked if she had any more of those to get rid of. At that time, she stated she did not have any more to get rid of.

Agent Aycocke testified that, upon speaking with the Defendant upon her arrest in May 2011, the Defendant told Agent Aycocke that the vehicle Williams had been driving on the night of the purchase, a white Mercury Mountaineer, belonged to her. Additionally, the phone number that the Defendant provided to Agent Aycocke as her phone number was the same number that Hulsey had called to set up the purchase. The Defendant admitted to Agent Aycocke that "Corey [Williams] would purchase quantities of Oxycodone at times and resell them for a profit. And [she] further stated that on several occasions that [she] and Corey would be together in her vehicle and . . . would together . . . go and make deliveries and sales of the Oxycodone." Agent Aycocke also confirmed that the pills Hulsey purchased from Williams and the Defendant were, in fact, Oxycodone. Ray Boswell testified that 602 Wright Road, the location in which the transaction occurred, was within 1,000 feet of Oldfield Park.

To the extent the Defendant contends that her alibi witness, Goss, claimed that the Defendant was at Goss' residence during the time the transaction occurred, we note that it is the role of the jury, as the trier of fact, to accredit witnesses' testimony. See Bland, 958 S.W.2d at 659. The jury clearly chose to accredit the testimony of Hulsey and Agent Aycocke over that of Goss, and we will not disturb that finding on appeal. See Winters, 137 S.W.3d at 655. Therefore, viewing the evidence with the strongest legitimate view in favor of the State, see Harris, 839 S.W.2d at 75, we conclude that the State introduced sufficient evidence for a jury to convict the Defendant of the sale or delivery of a Schedule II drug in a drug free zone. Accordingly, the Defendant is entitled to no relief on this issue.

*$40,000 Fine*

Finally, the Defendant challenges her $40,000 fine. When a statutory range of punishment permits a fine in excess of fifty dollars, the jury shall have the responsibility of determining the amount of the fine. See Tenn. Code Ann. § 40-35-301(b) (2010). "When imposing sentence, after the sentencing hearing, the court shall impose a fine, if any, not to exceed the fine fixed by the jury." Id. Our supreme court has held that fines shall be reviewed as part of the sentence. See State v. Bryant, 805 S.W.2d 762, 767 (Tenn. 1991). Thus, our standard of review is abuse of discretion. See State v. Bise, 380 S.W.3d 682, 707 (Tenn. 2012).

An offender who commits a Class C felony which falls under Tennessee Code Annotated section 39-17-432 will be subject to a fine not to exceed $40,000. See Tenn. Code Ann. § 39-17-432(2)(C). This Court has stated that "the trial court may not simply impose the fine as fixed by the jury." State v. Blevins, 968 S.W.2d 888, 895 (Tenn. Crim. App. 1997). Rather, "[t]he trial court's imposition of a fine . . . is to be based upon the factors and principles of the 1989 Sentencing Act, such as, prior history, potential for rehabilitation, financial means, and mitigating and enhancing factors." Id. (citing Bryant, 805 S.W.2d at 766). Although the trial court shall base its imposition of fine upon a defendant's financial means, or ability to pay, this factor is not controlling. See State v. Butler, 108 S.W.3d 845, 854 (Tenn. 2003).

At the sentencing hearing, the trial court made no findings on the record as to any of the necessary considerations for the imposition of the Defendant's fine. Without such findings, or any relevant information such as that pertaining to the Defendant's ability to pay, we are unable to conclude that the record supports the imposition of the $40,000 fine. We note, however, that Tennessee Code Annotated section 39-17-428(b)(9) provides a minimum fine for this offense of $2,000. See Tenn. Code Ann. § 39-17-428(b)(9) (2010) (stating that the mandatory minimum fine imposed for "first conviction for all felony drug offenses involving a scheduled substance" is $2,000). Therefore, we modify the amount of the fine from $40,000 to $2,000.

**CONCLUSION**

For the reasons set forth above, we affirm the Defendant's conviction. We modify the judgment, however, to reflect a reduction in the Defendant's fine from $40,000 to $2,000.

_____
JEFFREY S. BIVINS, JUDGE